(July 5, 1904.)

## MOE v. HARGER (BRADSHAW'S APPEAL).

[77 Pac. 645.]

WATER RIGHTS—NATURAL RESERVOIRS—DIVERSION OF WATERS—INJUNCTIVE RELIEF.

1. Evidence of expert and nonexpert witnesses with reference to the theory of the formation of a natural reservoir along the course of a stream examined, and held insufficient to justify a court in departing from the uniform and well-established doctrine, that the first appropriator has the first right; and in this case the position of appellants that their diversion and use of the water is not injurious or prejudicial to the rights of a prior appropriator lower down the stream is held untenable.

2. So soon as the prior appropriation and right of use is established, it is clear, as a proposition of law, that such appropriator is entitled to have sufficient of the unappropriated waters flow down to his point of diversion to supply his right, and an injunction against interference therewith is proper protective relief to be granted.

(Syllabus by the court.)

APPEAL from District Court in and for Custer County. Trial had before Honorable K. I. Perky, Judge. New trial denied by Honorable J. M. Stevens, Judge.

S. T. Moe commenced an action against a large number of appropriators and users of the waters of Big Lost river, in

Blaine and Custer counties. A judgment and decree was made and entered determining the respective rights and priorities of all the parties to the action, and an injunctive order was incorporated in the decree running against all the parties to the action restraining and enjoining each from in any way interfering with or diverting or using any of the waters of Big Lost river except in accordance with the terms of the decree. From an order denying a motion for a new trial, Thomas Bradshaw and other defendants appealed. Affirmed.

The facts are stated in the opinion.

N. M. Ruick, for Appellants, cites no authorities.

Sullivan & Sullivan and G. F. Hansbrough, for Respondents, cite no authorities on the point decided by the court.

AILSHIE, J.—This action was commenced in the district court against numerous appropriators and users of the waters from Big Lost river in Blaine and Custer counties. The controversy on this appeal arises over the peculiar situation and condition of the waters of that stream. The river rises far up in the mountains and during the high or flood waters in April, May and June each year flows in a continuous surface stream from its source to a few miles below Arco in Blaine county, a distance of upward of seventy-five miles. It is shown that about twenty-five or thirty miles below Arco is a place called the "Narrows," where the valley through which the stream flows is only about one-fourth of a mile wide, the bedrock coming to the surface there and the mountains closing in, and above which point the valley widens out into a basin some eight miles wide. This valley or basin is covered with a thin soil, and contains an unascertained depth of gravel deposit and extends for a number of miles up the stream from the Narrows. It appears that after the close of the flood season or high-water period the stream flowing through this valley above the Narrows gradually lessens until it finally disappears for a distance ranging from eight to fourteen miles above the Narrows. During the entire season, however, the water rises at the Narrows

and flows out through that point in a perpetual stream of about the same volume, flowing in the channel above the point where it sinks. It is shown by the evidence that in the springtime it takes from twenty to thirty days of high water or flood season to raise the stream and flood the valley above the Narrows sufficiently to cause the water to flow over the surface through the entire length of the valley. It is in this valley that the appellants in this case reside and have water rights subsequent, in point of time of appropriation and use, to the rights and claims of the respondents. At the trial appellants sought by the introduction of expert evidence and the testimony of witnesses who had lived in the community since 1872 to establish the fact that the taking of water from the stream above the point where it sinks and irrigating the lands within the valley above the Narrows does not in any manner lessen the flow of the water at the point where they rise and flow out through the Narrows at the lower end of the basin. In attempting to establish this proposition it was shown by at least one witness who has been familiar with the stream and country through which it flows since 1872, that there has been some irrigating going on in that basin for about twenty years, and that the water level in wells and other excavations made in the basin above the Narrows has been gradually rising from time to time until at the present time it is considerably higher than when he first made observations there. It is also shown that when he first knew the stream it went dry for a distance of at least fourteen miles from year to year during the dry or low-water period; whereas, in later years that distance has been shortening until it now goes dry for a distance of only about eight miles. In other words, the stream now sinks only about eight miles above the Narrows in the driest season of the year. In addition to this evidence, Mr. Ross, a civil engineer of wide reputation and recognized ability, who has also had large experience in practical irrigation, was called as an expert and testified to having made one examination of the stream and the basin above the Narrows and the general lay and contour of the country and the nature of the deposits therein. From his evidence it appears that the general level of the upper end of the

valley is about one hundred feet above the point where the water rises at the Narrows. He says that in his judgment when the flood waters come they fill up and saturate the entire gravel and earthern deposits of the basin, and that when that is done the water rises until the stream runs in a continuous flow on the surface throughout the length of the valley. That as the dry season comes on the water begins to sink higher up the valley, while the waters from the higher grounds, percolating through the soil and gravel, gravitate to the lower points and thus force the stream out at the lower end of the valley or the Narrows. He also says that since this flooding process takes place once every year (in the spring months), and fills up the entire valley or basin, which serves as a natural reservoir, it thereby stores a sufficient water supply to cause a continuous and uniform flow of the stream through the Narrows. In keeping with this theory of the witness, he testifies that in his opinion the use of the water from the stream above where it sinks during the irrigation period would not in any appreciable degree diminish the volume of water discharged from the basin at the Narrows, and that all the water used in irrigating the lands of the valley or basin not taken up by plant and vegetable life and lost by evaporation will find its way back to the stream and serve as a constant feeder thereto. On cross-examination he testifies that in the ordinary irrigation of the lands in that valley about seventy-five per cent of the water spread upon the land will be lost by evaporation and absorbed by plant and vegetable life.

If the entire volume of water should be diverted from the stream above the point where it sinks and applied to the lands in the irrigation thereof, and by the process seventy-five per cent should be lost, and only twenty-five per cent ever reach the stream again, it would be difficult to understand by what process the stream would remain as large at the point where the water rises as it would have been had the seventy-five per cent of the original flow not been diverted and lost. This court has uniformly adhered to the principle announced both in the constitution and by the statute that the first appropriator has the first right; and it would take more than a theory, and, in fact,

clear and convincing evidence in any given case, showing that the prior appropriator would not be injured or affected by the diversion of a subsequent appropriator, before we would depart from a rule so just and equitable in its application and so generally and uniformly applied by the courts. Theories neither create nor produce water, and when the volume of a stream is diverted and seventy-five per cent of it never returns to the stream, it is pretty clear that not exceeding twenty-five per cent of it will ever reach the settler and appropriator down the stream and below the point of diversion by the prior user.

Appellants complain of the action of the trial court in incorporating in the decree in this case an order perpetually enjoining them from in any manner interfering with or diverting or using the waters of Lost river except in accordance with the terms of the decree. By the decree the time was fixed from which each appropriator and claimant was entitled to have his right date and the number of inches to which he was entitled. It is the usual and approved practice in this state in all water cases where a decree is entered establishing the rights and priorities of the parties litigant to incorporate in the decree an order in the nature of cross-injunctions restraining each and every party thereto from in any wise interfering with the use of water by any other party thereto as fixed and established by the decree. That is what was done in this case, and we think it was proper to incorporate such an order in the decree.

A somewhat similar theory as to the storage and percolation of waters was advanced in the case of *Cartier v. Buck,* 9 Idaho, 571, 75 Pac. 612, and considered by this court at the February, 1904, term. In referring to the injunctive order contained in the decree, Mr. Justice Stockslager, speaking for the court, said: "Before the plaintiff in the lower court could obtain injunctive relief it was incumbent upon him to show that the use of the waters of Camas creek, or some of its tributaries, by the defendants, prevented the water flowing down to him in the natural channel, and also that, had they not disturbed it, it would have found its way to his premises." The right to the use of forty thousand inches of water from the Big Lost river was settled and decreed in this suit while the stream only carries nine thousand

inches at low water. It is therefore clear that no water will be left for some of the subsequent appropriators. Where prior appropriators have diverted the amount of water to which they are entitled and, for example, say one hundred inches, to which the next appropriator is entitled, is left in the stream and a settler above diverts a part or all of the remaining water, the presumption must at once arise that such diversion will be to the injury and damage of the appropriator entitled thereto. So soon as the prior appropriation and right of use is established, it is clear, as a proposition of law, that the claimant is entitled to have sufficient of the unappropriated waters flow down to his point of diversion to supply his right, and an injunction against interference therewith is proper protective relief to be granted. The subsequent appropriator who claims that such diversion will not injure the prior appropriator below him should be required to establish that fact by clear and convincing evidence. In the Cartier case the trial court had found against the storage, reservoir, and sponge theories of appellant, and this court, after reviewing the evidence, concluded that there was a substantial conflict and that the judgment of the lower court should be sustained. In this case the conclusion of the expert witness and possibly one nonexpert, is to the effect that the use of the waters in the basin and above the Narrows by appellants will in no way diminish the flow below the Narrows and can in no way affect or injure prior appropriators down the stream below the basin.

Many of the answers given by these witnesses on cross-examination are, to our minds, irreconcilable with their general conclusions. Since the trial court heard all the evidence and found against the theories of appellants, we must conclude that he understood them, and we think his findings and judgment on that point are correct. The judgment of the trial court should be affirmed, and it is so ordered. Costs awarded to respondents.

Stockslager, J., concurs.

Sullivan, C. J., having been a party to the action in the lower court did not sit at the hearing and took no part in the decision.